*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LIZA MICHELLE BARNETT, LPN.

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

        Petitioner-Appellee,

v

LIZA MICHELLE BARNETT, LPN,

        Respondent-Appellant.

UNPUBLISHED
May 06, 2025
3:06 PM

No. 366948
LARA Bureau of Professional
    Licensing
LC No. 20-023817

AFTER REMAND

Before: PATEL, P.J., and YATES and SHAPIRO, JJ.

PER CURIAM.

Respondent, Liza Michelle Barnett, LPN, appealed an order issued by the Board of Nursing Disciplinary Subcommittee (the Subcommittee) placing respondent on probation for one to three years and fining her $500 under MCL 333.16221(a) (negligence or failure to exercise due care) and (b)(*i*) (incompetence). This Court vacated the order of the Subcommittee and remanded the case for elaboration by the Subcommittee with respect to its ruling. On remand, the Subcommittee complied with the remand order. After reviewing the evidence, the Subcommittee clarified its findings and again concluded that respondent's conduct violated MCL 333.16221(a) and (b)(*i*). The Subcommittee placed respondent on probation for a minimum of one year, not to exceed three years, and ordered respondent's automatic discharge from probation after one year, upon her completion of the probationary terms set forth in the Subcommittee's order. We affirm.

## I. FACTUAL BACKGROUND

Our previous opinion set forth the relevant facts of this case:

-1-

On Wednesday, October 11, 2017, a nurse realized that the dressings of a patient in a nursing and rehabilitative care facility had not been changed since Sunday, October 8, 2017, despite a physician's order requiring nurses to change the patient's dressings every Monday, Wednesday, and Friday. Further, the dressings were marked as having been changed on October 9 and 10, 2017, in the patient's electronic medical record, which is maintained in an electronic system known as PointClickCare (PCC). The nurse who made the discovery spoke with her supervisor, who examined the patient's records and determined that respondent was responsible for changing the dressings on those two dates. The supervisor also determined that respondent had documented changing wound dressings on a second patient when she had not actually completed the dressing changes. On October 14, 2017, before respondent's next scheduled shift and a scheduled meeting with the facility's director of nursing to discuss an investigation of the matter, respondent made late entries in both patients' records. In the late entries, respondent documented that both patients had refused dressing changes.

Respondent admitted to the director of nursing and an investigator with the Bureau of Professional Licensing that she did not change either patient's dressings. Respondent maintained, however, that both patients refused treatment and that the PCC entries showing that treatment was performed were made unintentionally and accidently. She further explained that when the patients refused the dressing changes, she promptly advised the director of nursing and two oncoming shift nurses. And she insisted that she had not been adequately and properly trained on using PCC, that no co-workers were available to assist her in making the correct PCC entries when the patients refused treatment, and that the 24-hour book—a physical book used by staff to communicate with each other—was missing so written notations could not be made about the dressings. She also explained that the error was the result of "chaos" in the facility caused in part by ongoing construction, the presence of state nursing-home surveyors, and staffing shortages. Respondent additionally claimed that on October 14, 2017, she entered the facility to complete her continuing education requirements, at which time she used a nurse's laptop to make late or supplemental entries into the records of the two patients documenting their refusals to allow dressings to be changed on October 9 and 10, 2017. Respondent did not believe that the changes reflected a falsification of the record as she was simply correcting an innocent mistake.

Petitioner, LARA, presented evidence that respondent had been adequately trained on using PCC, that respondent was able to correctly use the system at the end of her training, and that the proper course of action when information is erroneously inputted into PCC is to then strike the error and enter the correct information. Further, petitioner submitted testimony from the director of nursing that she did not recall having been advised by respondent that the dressings had not been changed or that the entry she had made was inaccurate. Petitioner also introduced testimony from several witnesses that there were no known issues regarding the availability of the 24-hour book at the time in question, that there had been no construction specifically impacting the nursing station, and that there were no state surveyors at the facility on October 9 and 10, 2017. The director of nursing

claimed that when confronted, respondent told the director that she "forgot" to change the wound dressings. Petitioner presented the testimony of an expert in the field of nursing who opined that respondent's conduct constituted negligence, a failure to exercise due care, and incompetence.

Petitioner filed an administrative complaint against respondent under MCL 333.16221(a), (b)(*i*), and (b)(*vi*) (lack of good moral character). After a full evidentiary hearing, the administrative law judge (ALJ) issued a detailed proposal for decision (PFD) recommending that the Subcommittee conclude that respondent had not violated MCL 333.16221(a), (b)(*i*), or (b)(*vi*), and order that petitioner's complaint be dismissed with prejudice. The ALJ found by a preponderance of the evidence that respondent credibly testified that the facility never formally instructed her on how to properly use PCC. The ALJ further determined that the evidence revealed that respondent was not comfortable navigating PCC because she was taught to use the system by experienced nurses who each charted differently.

\* \* \*

The ALJ concluded that it was quite possible that respondent committed errors using PCC and returned to correct them, which did not constitute negligence, incompetence, or lack of good moral character. The ALJ determined that the facility was under significant construction, that patient files were stored in a disorganized manner, that "staffing deficiencies were persistent and ongoing" on October 9 and 10, 2017, that the surrounding circumstances constituted a reasonable explanation for why respondent could not document that the patients refused treatment, and that respondent told the director of nursing and other nurses about the refusals. The ALJ issued the PFD consistent with his findings of fact and conclusions of law.

Petitioner filed exceptions to the PFD, and respondent filed a response to the exceptions. Subsequently, the Subcommittee entered an order with respect to the findings of fact and conclusions of law, in which it accepted in part and rejected in part the findings of fact and conclusions of law identified in the PFD. The Subcommittee accepted the findings of fact to the extent that they constituted "a reiteration and summary of the testimony and evidence presented at the administrative hearing." The Subcommittee adopted the ALJ's findings of fact and accepted the ALJ's conclusion of law with respect to the disciplinary action brought under MCL 333.16221(b)(*vi*). But the Subcommittee rejected the ALJ's conclusions of law that petitioner had failed to prove by a preponderance of evidence that respondent was subject to disciplinary action under MCL 333.16221(a) and (b)(*i*). The Subcommittee stated that respondent documented that she changed wound dressings without actually performing the treatment and then made late entries claiming that the patient refused to allow her to change the dressings.

The Subcommittee next addressed the testimony of petitioner's expert witness and then reached its conclusion:

[The expert] testified that the standard of care requires that physician orders be followed and, if a patient refuses wound treatment, the standard of care requires the nurse to document the refusal and with a plan of action. [The expert] further testified that the standard of care and minimal standard of acceptable practice requires accurate and timely documentation of treatment.

In [the] expert['s] opinion, Respondent violated the standard of care and demonstrated incompetence by documenting that she had changed [a patient's] wound dressings before any treatment had been performed. Additionally, Respondent's late entry that occurred five days after the original entry, which made a change to detail [the patient's] treatment refusals, presented a delay in [his] care because other providers had no idea that [the] wound dressing had not been changed. [The expert] explained that if the patient had refused treatment, then Respondent's failure to timely document the refusal and a plan of action are violations of the minimal standard of practice.

Based on the evidence in the record, and in conjunction with the personal experience and expertise of the [Subcommittee] members, the [Subcommittee] finds that [the] expert['s] opinion correctly concludes that Respondent violated the standard of care by documenting patient treatment before any treatment was provided and that Respondent failed to meet the minimal standards of acceptable practice by failing to timely document [the patient's] refusal, thereby allowing the patient record to inaccurately reflect that [his] wounds had been treated for five days. [Record citations omitted.]

Later, the Subcommittee issued a final order placing respondent on probation for one to three years, fining her $500, and ordering her to pay costs for the statutory violations. Respondent moved for rehearing or reconsideration, which was denied by the Subcommittee for failure to demonstrate a material error. [*In re Barnett*, unpublished per curiam opinion of the Court of Appeals, issued September 19, 2024 (Docket No. 366948), pp 1-5 (brackets in original).]

We decided that the Subcommittee's decision was inadequate to allow for appellate review, and we explained that we could not tell whether the Subcommittee had reviewed the most pertinent aspects of the ALJ's recommendations, specifically the ALJ's evaluation of the expert witness's testimony and respondent's claims. *Id*. at 9. We noted that respondent had offered a version of events that she claimed revealed that her conduct did not constitute negligence, a violation of due care, or incompetence—claims that the ALJ had fully embraced. *Id*. at 8-9. But nothing in the Subcommittee's ruling indicated that it had considered the bases of the ALJ's recommendation. *Id*. at 9. We stated:

. . . [I]n examining the Subcommittee's ruling, we find no acknowledgment whatsoever of the testimony and evidence favorable to respondent, let alone an effort to explain why it rejected the evidence. This is especially concerning because the ALJ relied on that evidence in issuing the PFD. The Subcommittee simply ignored the bases for the ALJ's ultimate recommendations. We cannot ascertain from the Subcommittee's order whether it found that respondent's assertions lacked credibility, whether it found the assertions to be true but not relevant to a resolution of the charges, or whether it in fact reviewed or considered those assertions.

MCL 333.16237(1) and (3) make clear that the Subcommittee was required to review the findings of fact and conclusions of law, but the Subcommittee's written ruling does not evidence that it reviewed the most pertinent aspects of the ALJ's PFD, including in regard to petitioner's expert, and it gave no shrift to any of respondent's claims. Similarly, MCL 333.16237(4) obligated the Subcommittee to decide whether a preponderance of the evidence supported the ALJ's findings of fact and conclusions of law, but absent any indication in its ruling that the Subcommittee actually reviewed or considered the reasons at the heart of the ALJ's recommendations, we cannot discern whether the Subcommittee properly applied the preponderance standard. Thus, with respect to the question whether the Subcommittee's decision was supported by competent, material, and substantial evidence on the whole record, we cannot properly evaluate that issue when the Subcommittee's decision did not reflect that it reviewed and considered important components of the PFD issued by the ALJ.

In sum, we hold that the Subcommittee's decision was inadequate for the reasons expressed above, making it impossible for us to properly resolve this appeal. We thus reverse and remand for elaboration by the Subcommittee with respect to its ruling. [*Id.*]

On remand, the Subcommittee reviewed the administrative record, its previous findings of fact and conclusions of law, and this Court's opinion and order before issuing new findings of fact and conclusions of law. The Subcommittee accepted the ALJ's findings of fact as a reiteration of the testimony and evidence presented at the administrative hearing. The Subcommittee accepted the ALJ's conclusion that respondent did not violate MCL 333.16221(b)(*vi*) (lack of good moral character), but it rejected the ALJ's conclusion that petitioner failed to prove by a preponderance of the evidence that respondent had violated MCL 333.16221(a) and (b)(*i*). The Subcommittee noted that the evidence presented at the administrative hearing established that respondent initially documented changing the wound dressings for a patient when she had not done so, but she made entries five days later reflecting that the patient refused treatment three times. The Subcommittee additionally noted that the expert witness's testimony established that the standard of care required nurses to follow physicians' orders and required that if a patient refused wound treatment, a nurse must "document the refusal *with a plan of action, to include offering pain medication, accessing* [sic] *pain level, and attempting to do a dressing change at another time*." The expert witness's testimony also established that the standard of care and minimal standard of acceptable practice required accurate and timely documentation of treatment. The Subcommittee found that the expert witness correctly concluded that respondent had violated the standard of care both by documenting treatment before any treatment was provided and by failing to document the patient's refusal.

-5-

The Subcommittee further found that respondent failed to adequately notify the ordering physician, a supervising nurse, or the oncoming shift nurse about patients refusing treatment, and it found that respondent's voicemail message to her supervisor was inadequate. The Subcommittee found respondent's testimony concerning the facility conditions, her inadequate PCC training, and her difficulty finding assistance to be credible. But the Subcommittee also found that respondent's own admitted conduct of documenting treatment she did not perform, inaccurately documenting treatment, failing to have a plan of action following patient refusal, and failing to communicate the refusal to a physician, supervisor, or oncoming nurse violated MCL 333.16221(a) and (b)(*i*). Accordingly, the Subcommittee concluded that petitioner had established by a preponderance of the evidence that respondent's conduct violated MCL 333.16221(a) and (b)(*i*). The Subcommittee vacated its initial order and ordered that respondent be placed on probation for one to three years and that she pay a $500 fine. Additionally, the Subcommittee declared that respondent "shall be automatically discharged from probation after one (1) year, upon receipt of satisfactory evidence of the successful completion of the probationary terms as set forth [in the order], PROVIDED compliance occurs within the maximum three (3) year period, Respondent has paid the [$500] fine . . . , has complied with the terms of this Order and has not violated the Public Health Code."

## II. LEGAL ANALYSIS

This Court reviews the findings, decisions, rulings, and orders from disciplinary boards or subcommittees on appeal under Const 1963, art 6, § 28. *In re Sangster*, 340 Mich App 60, 66; 985 NW2d 245 (2022). Pursuant to Const 1963, art 6, § 28, a court's review of an agency decision is limited to determining whether the agency action was authorized by law and whether the agency's findings of fact were "supported by competent, material and substantial evidence on the whole record." " 'Substantial evidence' means evidence that a reasonable person would find acceptably sufficient to support a conclusion." *Sangster*, 340 Mich App at 67. "To satisfy this standard there must be more than a scintilla of evidence, but less than a preponderance of the evidence may be enough." *Dep't of Community Health v Anderson*, 299 Mich App 591, 598; 830 NW2d 814 (2013). In reviewing the findings of an agency, we must consider the entire record to determine whether the findings were supported by competent, material, and substantial evidence. *Sangster*, 340 Mich App at 67.

MCL 333.16221 defines the grounds that can result in disciplinary proceedings against a licensed professional. MCL 333.16221 provides, in relevant part:

> [T]he department shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, and may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration. The department may hold hearings, administer oaths, and order the taking of relevant testimony. After its investigation, the department shall provide a copy of the administrative complaint to the appropriate disciplinary subcommittee. The disciplinary subcommittee shall proceed under section 16226 if it finds that 1 or more of the following grounds exist:
>
> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including

negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

(b) Personal disqualifications, consisting of 1 or more of the following:

(*i*) Incompetence.[1]

MCL 333.16237(4) provides that a disciplinary subcommittee is not bound by the recommended findings of a hearing officer, and it vests subcommittees with discretion to determine whether the preponderance of the evidence supports or does not support a hearing officer's findings of fact or conclusions of law. *Anderson*, 299 Mich App at 599.

The Subcommittee's final order and conclusions of law on remand were supported by competent, material, and substantial evidence. See *Sangster*, 340 Mich App at 67. As ordered by this Court, the Subcommittee elaborated on the findings of fact and conclusions of law supporting its decision in respondent's case, and the Subcommittee evaluated the expert witness's testimony and respondent's evidence. The Subcommittee found respondent's testimony regarding working conditions at the facility, her training on PCC, and her difficulty finding help to be credible. But the Subcommittee also found that respondent admitted she documented changing patients' wound dressings two days in a row without doing so, without adding notes to explain the error, without creating a plan of action following the patient refusals, and without adequately communicating the refusals before the end of her shift. The Subcommittee also noted the expert's testimony regarding the applicable standards of care and minimal standards of acceptable practice. The Subcommittee found that respondent had failed to adequately notify the ordering physician, a supervising nurse, or an oncoming nurse, and it found that respondent's attempt to call her supervisor was inadequate. Ultimately, the Subcommittee found that the expert witness correctly concluded that respondent's admitted conduct violated the appropriate standards of care and also failed to meet the minimal standards of acceptable practice.

The record reflects that, during the investigation by the Bureau of Professional Licensing, respondent admitted she inaccurately documented providing care to patients' wound dressings on October 9, 2017, and on October 10, 2017, when she had not done so. Respondent further admitted she returned to the facility on October 14, 2017, to make late entries in the patients' notes stating the patients had denied treatment on October 9, 2017, and October 10, 2017. Likewise, respondent testified at the administrative hearing that she returned to the facility on October 14, 2017, and made late entries into two patients' records to reflect that they had denied treatment. Respondent testified that she reported her patients' refusals to her supervisor and the director of nursing. But respondent's supervisor and the facility's director of nursing denied respondent's assertions. The facility's wound-care coordinator also did not remember respondent reporting any patient refusals or difficulties changing a patient's wound dressing. The expert witness testified that the standard

---

[1] MCL 333.16221 has been amended several times since October 9, 2017, but the quoted language has remained the same after each amendment. See 2017 PA 246; 2018 PA 463; 2020 PA 135; 2020 PA 232; 2023 PA 47; 2023 PA 209.

of care required nurses to document treatment in a timely manner and also required that nurses document when a patient refused treatment in real time and provide a plan of action for offering treatment in the future. The expert witness also testified that if a patient refused treatment three times, nurses should document the refusal and notify a supervisor, a wound-care nurse, or a doctor.

The ALJ's recommendation concluded that the expert's testimony included "concessions" regarding PCC competence, chaotic working environments, and the absence of a late-entry policy at the facility. The ALJ found that, because of those concessions, it was possible that respondent made errors while using PCC and later corrected the errors, and it found it was possible the errors and corrections did not constitute negligence, incompetence, or lack of good moral character. But the expert testified that a nurse would violate the standard of care by failing to document treatment or unsuccessful treatment in a timely manner, even if the 24-hour book was not available. Further, the expert testified that the failure to document treatment or patient care in a timely manner would violate the standard of care even if a nurse verbally communicated the information to the director of nursing. The expert explained that a nurse who waited until the end of a shift to perform all documentation violated the standard of care because it did not meet "continuity of care," meaning that the patients' medical staff did not have updated information when it was available. The expert emphasized that this conduct would still be considered a violation even if all staff in a facility did the same, and she emphasized that that conduct would be a violation even if it were the result of circumstances outside a nurse's control. The expert acknowledged that respondent's facility did not have any policies requiring the staff to make late entries within 48 hours, but she testified that the standard practice for nurses was to make entries within 24 to 48 hours. No additional evidence about the applicable standards of care for nurses was provided at the administrative hearing.

The Subcommittee's findings of fact and conclusions of law on remand clarified that the Subcommittee did consider the testimony and evidence favorable to respondent and that it found respondent's testimony to be credible. But the Subcommittee decided that respondent's admitted conduct constituted a violation of MCL 333.16221(a) and (b)(*i*) based upon the expert's testimony at the administrative hearing. Considering the expert's testimony regarding applicable standards of care and minimal standards of acceptable practice, we conclude that a reasonable person could find that substantial evidence supported the Subcommittee's conclusion that respondent's conduct constituted a violation of MCL 333.16221(a) and (b)(*i*). See *Sangster*, 340 Mich App at 67.

Affirmed.

/s/ Sima G. Patel
/s/ Christopher P. Yates

SHAPIRO, J., did not participate.